# In the United States Court of Federal Claims

No. 14-233C
(Filed: June 26, 2014)
*Opinion originally filed under seal on June 18, 2014

| | |
|---|---|
| ARKRAY USA, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) **Bid Protest; Federal Supply Schedule; Uniform Formulary; 28 U.S.C. § 1491(a)(2), Remand** |
| Defendant, | ) |
| and | ) |
| ABBOTT DIABETES CARE SALES CORPORATION, | ) |
| Defendant-Intervenor. | ) |

*Jonathan A. DeMella*, Seattle, WA, for plaintiff.

*Sonia M. Orfield*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Robert E. Kirschman, Jr.*, Director, for defendant.

*Donna L. Yesner*, Washington, DC, for defendant-intervenor. *Stephen E. Ruscus*, Washington, DC, of counsel.

## OPINION

In this post-award bid protest case, ARKRAY USA, Inc. ("plaintiff" or "ARKRAY"), challenges the Defense Health Agency's ("DHA" or "the agency") selection of Abbott Diabetes Care Sales Corporation's ("ADCSC" or "defendant-

intervenor") self-monitoring blood glucose system ("SMBGS") test strips ("strips") for the TRICARE uniform formulary ("UF"),[1] and its establishment of a blanket purchase agreement ("BPA") with ADCSC for the purchase of the strips.

Pending before the court are the parties' cross-motions for judgment on the administrative record ("AR") under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") and plaintiff's motion for a permanent injunction. Plaintiff largely argues that the award to ADCSC was improper for two reasons. First, plaintiff contends that ADCSC was not eligible to receive a BPA because, as explained infra, ADCSC did not hold a Federal Supply Schedule ("FSS") contract at the time it submitted its bid, as required by the solicitation.[2] Plaintiff separately contends that DHA, due to its alleged bias in favor of ADCSC, did not require ADCSC to have in place a process to supply patients with blood glucose meters that complied with the Trade Agreements Act ("TAA"),[3] as required by the solicitation. For the reasons explained below, the parties' cross-motions are **DENIED**, the court **STAYS** consideration of plaintiff's motion for a

---

[1] 10 U.S.C. § 1074g requires the Department of Defense ("DoD") to establish a pharmacy benefits program for the military. The UF is the approved list of pharmaceutical agents that must be available to eligible beneficiaries under the TRICARE pharmacy benefits program. See generally Coal. for Common Sense in Gov't Procurement v. United States, 576 F. Supp. 2d 162, 164-65 (D.D.C. 2008) (describing TRICARE pharmacy benefits program). Regulations governing the selection of pharmaceutical agents are codified at 32 C.F.R. § 199.21.

[2] Rather, a corporate affiliate of ADCSC—Abbott Laboratories Inc.—appears to have held the FSS contract for the pharmaceutical agents quoted in ADCSC's bid.

[3] Where applicable, the TAA generally prohibits the federal government from procuring products from a foreign country that has not signed a reciprocal agreement on government procurement. See 19 U.S.C. § 2512.

permanent injunction, and the case is **REMANDED** to the DHA Contracting Officer for further proceedings consistent with this opinion.

I.  BACKGROUND

    **a. Responsibilities and procedures related to establishing TRICARE BPAs**

Before DHA executes a BPA with one or more companies for the acquisition of pharmaceutical agents, those pharmaceutical agents must be selected for inclusion in the TRICARE formulary.  See AR 224.  The government's decision to include a pharmaceutical agent is based upon its relative clinical and cost-effectiveness, as determined by a Pharmaceutical and Therapeutics Committee ("P&T Committee"), which is composed of representatives of pharmacies of the uniformed services and other military healthcare providers.  See 10 U.S.C § 1074g(b).  Before final formulary decisions are made, a Beneficiary Advisory Panel ("BAP"), including representatives of beneficiaries, contractors, and providers, has an opportunity to comment on any proposed changes to the formulary.  See 10 U.S.C. § 1074g(c).  The DHA Director makes final formulary decisions, taking into account both the P&T Committee's recommendations and the BAP's comments.  Id. §§ (a)(2)(A)-(D), (c); 32 C.F.R. § 199.21(g)(3).

Although the DHA Director makes final formulary decisions, the DHA Contracting Officer assigned UF BPA duties ("Contracting Officer") is ultimately responsible for the solicitation, execution, and administration of the UF BPA(s).  See AR 1816.  FAR 8.405–3 identifies several factors that the Contracting Officer should consider when determining whether to establish a single-award BPA, including the

administrative costs of BPAs, the scope and complexity of the requirements, and the benefits of on-going competition.  See 48 C.F.R. § 8.405–3(a)(3)(iv).

In managing the solicitation, the Contracting Officer is tasked with coordinating and communicating with the DoD organizations that are responsible for reviewing the relative clinical effectiveness of the pharmaceutical agents under review, as well as the Department of Veterans Affairs ("VA") FSS Service.  See AR 1816.  Prior to forwarding quotes to the P&T Committee for a cost effectiveness review, the Contracting Officer is responsible for conducting a review to ensure that the quotes are complete and comply with the posted instructions for submitting BPA quotes.  See AR 1819-20 (Contracting Officer's Statement of Facts describing requirements for establishing BPA).  In this connection, the Contracting Officer compares quotes to the current FSS files available from the VA to ensure that (1) quotes are covered by the FSS contract identified in the quote, (2) the quoted FSS contract number and FSS contract holder have not changed, (3) the quoted prices do not exceed the lower of current FSS or "Big 4" pricing,[4] and (4) all open FSS administrative matters have been resolved.  Id.  In the event that a quote contains an irregularity "that inhibit[s] the contracting officer's ability to accept the quote and execute a BPA," that quote must be rejected unless the irregularity can be resolved prior to forwarding the quote to be evaluated for cost effectiveness.[5]  See AR 1819.  Once

---

[4] The "Big 4" agencies are the VA, DoD, the U.S. Public Health Service, and the Coast Guard. See Merck & Co., 2005 CPD ¶ 98, n.6 (Comp. Gen. May 13, 2005).

[5] According to the Contracting Officer's Statement of Facts, prior to forwarding the quote to the P&T Committee, "[a]ll irregularities are fully resolved and documented . . . to ensure that evaluation is based on only those quotes [that] fully support execution of a UF BPA . . . ."  AR 1819.

the bid has been reviewed and the DHA Director makes a final decision, the BPA(s) are executed.  AR 1820.

For the twelve month period between March 2012 and February 2013, the TRICARE Pharmacy Benefit Program submitted $94.6 million of costs for 161.8 million test strips dispensed to approximately 325,000 eligible beneficiaries.  See AR 255; Def.'s Opp'n to Pl.'s Mot. for a Prelim. Inj., Ex. 1 ¶¶ 4, 13(a) (Declaration of Lieutenant Colonel Robert C. Conrad), ECF No. 21.  During this same period, five manufacturers ([. . .] Abbott;[6] and [. . .]) represented over [. . .]% of the total market share, with Abbott representing [. . .]% of the market share.  AR 256.  Once the formulary decision and new BPA is fully implemented, the agency estimates that it will reduce expenditures to $15 million for the first year.  See Def.'s Opp'n to Pl.'s Mot. for a Prelim. Inj. Ex. 1 ¶ 13(a), ECF No. 21.

### b.  Solicitation criteria

On June 13, 2013, the agency posted a solicitation for glucose test strips on its website.  See AR 200, 1821.  Among other things, the solicitation contained a general template for submitting quotes, with specific requirements pertaining to the FSS and TAA.  See AR 116, 200, 223.  As to the former, the solicitation states that offerors "must have an existing FSS Contract for any pharmaceutical agent(s) quoted in this UFBPA at the time the quote is submitted, and at the time the UFBPA is executed.  All terms of [the] Company's FSS Contract apply to this agreement."  AR 118, 225.

---

[6] The record does not indicate which Abbott-affiliated entity (e.g., ADCSC; Abbott Diabetes Care, Inc.; Abbott Laboratories Inc.) accounted for this level of market share.

With regard to TAA-compliance, the BPA template provides:

Meters
- Manufacturer must have a process to supply meters to beneficiaries at no cost.
- Must be Trade Agreement[s] Act-compliant[.]

AR 200, 228.

### c. Submission of quotes and award to the defendant-intervenor

Five vendors submitted quotes, including ARKRAY and ADCSC.[7]  AR 564. Defendant-intervenor filled in the following language in the BPA template:

> 1. PRICE QUOTE FOR INCLUSION ON UNIFORM FORMULARY: By submitting this Uniform Formulary Blanket Purchase Agreement (UFBPA) price quote, **Abbott Diabetes Care Sales Corporation ("ADC")** henceforth, Company, agrees to provide pharmaceutical agents to military treatment facilities (MTFs), and the TRICARE Mail Order Pharmacy (TMOP) at the prices quoted at the attached Appendices.

AR 223 (emphasis in original).  With regard to the TAA-compliance of its meters, ADCSC's quote stated that "Abbott Diabetes Care manufactures meters in a TAA nation," and listed an address for a manufacturing facility in Singapore.[8]  AR 1085. Defendant-intervenor represents that ADCSC was "in the process of manufacturing meters in Singapore that would comply with the BPA requirement" at the time ADCSC submitted its quote, however it is undisputed that ADCSC had been manufacturing

---

[7] These companies included ADCSC; ARKRAY; [. . .] AR 1521.  [. . .].

[8] In contrast to its more limited claims concerning the TAA-compliance of its meters, ADCSC's bid stated that "[a]ll Abbott Diabetes Care test strips are manufactured in a TAA nation."  AR 1084 (emphasis added).  ADCSC's bid lists an address in the United Kingdom as the manufacturing site.  Id.

6

meters in China and had not yet imported any of the meters manufactured in Singapore for distribution to DHA.  See Intervenor's Opp'n to Pl.'s Mot. to Suppl. 6, ECF No. 39.

On July 17, 2013, an agency employee completed a "BPA Quote Review Checklist" in which the employee evaluated whether ADCSC's quote complied with the solicitation's criteria.  See AR 1513-15.  To determine whether ADCSC's "current FSS contract is valid," the checklist required the reviewer to "[m]ake sure that [the] name on [the] quote matches [the name on the] FSS Contract."  AR 1513.  Notwithstanding the undisputed fact that ADCSC does not hold an FSS contract in its own name, the DHA employee notated the BPA Quote Review Checklist to reflect that ADCSC's quote satisfied the solicitation's FSS requirement.[9]  AR 1513.

At its August 2013 meeting, the P&T Committee reviewed the cost information provided in the offerors' quotes and concluded that ADCSC's test strips were the most cost effective.  AR 570-72.  Accordingly, the P&T Committee recommended that ADCSC's strips be designated as the only strips available on the formulary.  Id.  This decision was made public at a September 19, 2013 BAP meeting.  See AR 670, 2164.  The BAP agreed with the recommendation that ADCSC be the sole manufacturer listed

---

[9] The court notes that the record does not appear to contain a similar checklist for the final bid that ADCSC submitted.  In an undated "Memo to File," the Contracting Officer explained that several of the offerors had submitted quotes either on incorrect forms or that included other errors.  For example, ADCSC had apparently added language to the solicitation and "shortened the required 11-digit National Drug Code to 5 digits, making it impossible to verify the prices on the Federal Supply Schedule."  AR 1521.  Indeed, the July 17, 2013 checklist for ADCSC contains the notation, "Not All NDCs in FSS Contract."  AR 1514.

The aforementioned Memo to File states that four of the offerors had submitted faulty bids, were notified of their errors, and that each of the four sent in a corrected quote on July 25, 2013.  Id.

on the formulary, but recommended a longer implementation period to reduce the risk of complications while coordinating the medical benefits with new and existing patients. AR 639-44.

On September 19, 2013, following the public posting of the formulary recommendation, DHA employees held a teleconference with ADCSC "to discuss the process Abbott promised to have to provide meters to beneficiaries . . . in the event that the [DHA Director] were to approve the P&T [Committee's] formulary recommendations." AR 2164-65. Abbott indicated that it would be able to provide TAA-compliant meters as soon as November 1, 2013, but that the company would not have [. . .] TAA-compliant meters by that date. See AR 2165. Later that day, an ADCSC employee e-mailed DHA and stated that ADCSC would provide the agency with an updated TAA-compliant meter schedule; however, that update was not provided until November 20, 2013. See AR 2168.

Between October 1, 2013 and October 21, 2013, a DHA employee sought to verify ADCSC's FSS status by reviewing (1) a printout from a VA database and (2) a copy of a contract modification in which a type of test strip that is sold by ADCSC was added to an FSS contract. See AR 1522-25. With regard to the former, the printout listed "ABBOTT/DIA as the "vendor" for certain diabetes products, AR 1524, however there is no indication in the record as to the legal relationship between ABBOTT/DIA and ADCSC. With regard to the latter, the contract modification listed "Abbott Laboratories Inc." as the FSS-holder, which defendant-intervenor has not disputed is not the same legal entity as ADCSC.

8

On October 24, 2013, the Contracting Officer issued a memorandum in which he stated that he had reviewed the minutes and recommendations of the P&T Committee and determined that the Committee's evaluation had been conducted in accordance with the applicable regulations. AR 565. Accordingly, the Contracting Officer determined that the quotes could be accepted and that a BPA could be executed upon approval by the P&T Committee Chair and the DHA Director. Id. On November 7, 2013, the DHA Director approved the P&T Committee's recommendations (as modified by the BAP). AR 644. The Contracting Officer executed the BPA with ADCSC on November 12, 2013. AR 692.

### d. Proceedings before the Government Accountability Office and the instant litigation

On September 27, 2013, ARKRAY filed a protest with the Government Accountability Office ("GAO") in which it challenged the selection of ADCSC for the formulary. See Arkray USA, Inc., 2014 CPD ¶ 90 (Comp. Gen. Mar. 5, 2014). On September 30, 2013, ARKRAY withdrew its protest after being informed that a final decision had not yet been made with regard to the formulary. AR 1840. After the Contracting Officer executed the BPA on November 12, 2014, ARKRAY re-filed its protest. AR 1-112. GAO denied the protest on March 5, 2014. AR 1834.[10]

---

[10] ARKRAY's protest before the GAO contended that (1) DHA unfairly conveyed a competitive advantage on ADCSC by allowing ADCSC to offer a suite of test strips and meters that did not comply with the TAA- and FSS-related evaluation criteria, and (2) DHA improperly accepted ADCSC's quote despite the fact that ADCSC's meters—[. . .]—had not been manufactured in a TAA-compliant country. AR 1758, 1787-88. The GAO determined that the solicitation was patently ambiguous with regard to whether meters were required to be listed on an offeror's FSS contract, and that ARKRAY's objections on this ground were therefore untimely. AR 1841-43.

9

Plaintiff timely filed suit in this court on March 26, 2014. Because the government had sought to notify beneficiaries of a formulary change on May 1, 2014, the court—at the government's urging—endeavored to resolve the matter on an expedited schedule. The government later sought to extend that schedule, however, after the agency decided to delay its implementation of the formulary change until August 6, 2014. See Def.'s Mot. for Clarification, ECF No. 27.

The parties subsequently engaged in a protracted dispute concerning the contents of the administrative record. Following an in camera review of various materials—including those exchanged between the agency and defendant-intervenor pursuant to a "Joint Defense Agreement,"[11] the court twice ordered the government to add materials to the record that should have been included in the administrative record under the court's rules and that were otherwise necessary for effective judicial review. See Orders, ECF Nos. 44, 75. Briefing on the parties' cross-motions for judgment on the administrative record was completed on May 30, 2014, and oral argument was held on June 9, 2014.

---

The GAO also rejected ARKRAY's second protest ground because GAO concluded that DHA had reasonably relied on ADCSC's representation that meters sold under the BPA would be manufactured in Singapore, a TAA-designated nation. AR 1843.

[11] As the court noted in its most recent order concerning the administrative record:

> The court has serious doubts about the appropriateness of a joint defense agreement in any case involving record review of a procurement decision because the government's interests, though at times aligned with the defendant-intervenor's, do not always require defending the agency's award decision. See, e.g., Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1379, 1381 (Fed. Cir. 2012) (allowing original awardee to challenge Army's decision to undertake corrective action).

Order at 9, n.5, ECF No. 75.

## II. DISCUSSION

### a. Standard of review

The standard of review in bid protest cases is well-established. The court will uphold an award decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). To prevail, the protester must demonstrate that either (1) the agency's decision was irrational, id. at 1351, or (2) the agency violated a regulation or procedure in a manner that significantly prejudiced the protester, Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009). Where a protester seeks to demonstrate that the award decision was irrational, it must demonstrate that the agency's exercise of discretion lacked any "coherent and reasonable explanation." Banknote, 365 F.3d at 1351.

To the extent that the court must resolve questions of fact in order to reach a decision, the court does so "from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005). Nevertheless, if the court determines that it "simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81, 100, 103 (2011) (where record requires further development, court can either remand to the agency or obtain testimony directly from agency officials); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 532, 545-47,

549 (2010) (remand appropriate after review of evidence indicated source selection authority may have failed to perform required analysis).

### b. The parties' arguments

Plaintiff's bases for challenging the award to ADCSC fall into two general categories: issues related to the solicitation's FSS-related requirements, and issues related to the solicitation's TAA-related requirements. These arguments are briefly summarized below.

#### i. The parties' FSS-related arguments

With regard to the FSS-related requirements, plaintiff argues that ADCSC was ineligible for award because (1) ADCSC did not hold an FSS contract with the government at the time the quote was submitted, and (2) ADCSC's meters are not listed on an FSS contract. As to the first issue, plaintiff contends that DHA improperly allowed ADCSC to use an FSS contract that was held in the name of one of ADCSC's corporate affiliates—rather than ADCSC itself—to satisfy the FSS requirement. With regard to meters, specifically, plaintiff urges the court to interpret the solicitation as including meters as a "<u>quoted</u> pharmaceutical agent" on the theory that offerors recouped the cost of their otherwise free meters by increasing the quoted prices of their test strips. Under this reading, offerors whose meters were not listed on an FSS contract would be ineligible for award, and plaintiff contends that ADCSC's meters were not listed on any FSS contract whatsoever. Lastly, plaintiff claims that ARKRAY would have submitted a price quote for more competitive products had it known that its meters did not need to be listed on an FSS contract. Pl.'s Mot. for J. on Admin. R. 32, n.14, ECF No. 49.

In a footnote, defendant-intervenor dismisses as "frivolous" plaintiff's argument that ADCSC was ineligible for award because ADCSC did not have an FSS contract. Intervenor's Cross-Mot. for J. on Admin. R. 43, n.17, ECF No. 56-1 (asserting that "[a] search of [ADCSC's] products on the VA website indicates they are on an FSS contract held by the corporate organization of which [ADCSC] is a part"). For its part, the government argues that the solicitation did not explicitly preclude offerors from relying on FSS contracts held by their corporate affiliates in meeting this requirement, and belatedly moved to supplement the administrative record with materials that the government claims demonstrate ADCSC's authority to negotiate on behalf of its affiliates.[12] According to the government, "it seems clear that both the agency and Abbott intended that the award be made to the company on the FSS and any contrary result was inadvertent." Def.'s Cross-Mot. for J. on Admin. R. 47-48, ECF No. 57. The government also suggests that DHA and ADCSC can "correct the mistake" if necessary by modifying the contract under 48 C.F.R. § 14.407–4(a).[13] Regarding plaintiff's

---

[12] On June 6, 2014, the government moved to supplement the administrative record with several hundred pages of documents related to the FSS contract between Abbott Laboratories Inc. and the United States, as well as ADCSC's authority to negotiate with the government. See Def.'s Mot. to Suppl., ECF No. 77. The government acknowledges that it previously opposed ARKRAY'S April 11, 2014 motion to add these same materials to the record on the grounds that DHA relied on the VA's website—and not these documents—in order to verify offerors' FSS information. Accordingly, the government's motion is **DENIED** on the grounds that the subject documents were not considered by the Contracting Officer in connection with his finding that ADCSC had an FSS contract and thus could not have been used to support the Contracting Officer's decision.

[13] FAR 14.407–4(a) provides: "When a mistake in a contractor's bid is not discovered until after award, the mistake may be corrected by contract modification if correcting the mistake would be favorable to the Government without changing the essential requirements of the specifications." 48 C.F.R. § 14.407–4(a).

alternative argument—that blood glucose meters constituted "quoted pharmaceutical agents" that needed to be listed on an FSS contract—the government and defendant-intervenor contend that plaintiff's interpretation is unsupported by a plain reading of the solicitation.

### ii. The parties' TAA-related arguments

Plaintiff's TAA-related arguments can be framed as follows: (1) the solicitation required offerors to have imported at least some meters that had been manufactured in a TAA-compliant country at the time bids were submitted; (2) DHA failed to make a reasonable inquiry into whether or not ADCSC would be able to comply with the TAA-requirement once DHA had reason to doubt ADCSC's ability to perform; and (3) had ARKRAY known that it could submit quotes for meters that were not presently being manufactured in a TAA-compliant country, ARKRAY would have modified its bid. Implicit in plaintiff's first two arguments is the contention that the court should interpret the solicitation in light of the agency's pre-solicitation determination that [. . .] would be ineligible for award because its meters—like ADCSC's—were being manufactured in a non-TAA-compliant country. Plaintiff appears to contend that this earlier finding demonstrates sufficient pro-ADCSC bias that the court must set aside the award.

The government and defendant-intervenor respond by arguing that the plain language of the solicitation demonstrates that the TAA-requirement was a performance—rather than an evaluation—requirement. Specifically, they argue that it would be absurd to read the contract as requiring offerors to relocate their manufacturing facilities prior to receiving an award—particularly where, as here, the offerors expected to have several

months following award to ramp up production in a TAA-compliant country.  The government and defendant-intervenor also point to record evidence that tends to show that DHA employees inquired into ADCSC's manufacturing schedule prior to the November 12, 2014 award, and that ADCSC provided adequate assurances from which DHA reasonably concluded that ADCSC would be able to perform.

### c. Remand to the agency is necessary to determine the basis for the Contracting Officer's conclusion that ADCSC's bid complied with the solicitation's FSS requirements

The parties' arguments turn on the proper interpretation of the solicitation's FSS- and TAA-related requirements, and the court applies the same principles governing contract interpretation to the interpretation of solicitations.  Banknote, 365 F.3d at 1345, n.4.  As the Federal Circuit has explained:

> We begin with the plain language of the document.  The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation.  If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them.  Finally, we must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.

Id. at 1353 (internal citations omitted).

The court begins by finding that the plain language of the solicitation unambiguously required the company offering the price quote to hold an FSS contract at the time it submitted its quote and at the time of BPA execution.  The solicitation states: "[t]he company must have an existing FSS contract for any pharmaceutical agent(s) quoted in this UFBPA at the time the quote is submitted, and at the time the UFBPA is executed."  AR 225.  Offerors were required to list the name of the company that "agrees

15

to provide pharmaceutical agents to military treatment facilities (MTFs), and the TRICARE Mail Order Pharmacy (TMOP) at prices quoted . . . ." AR 223. Defendant-intervenor's quote lists "Abbott Diabetes Care Sales Corporation" as the offeror, and does not expressly identify any of the corporate affiliates that ADCSC may have relied on in meeting the solicitation's eligibility requirements.

Whether ADCSC could properly hold itself out as having an FSS contract—and was thus eligible for the BPA—is a question that the court believes must be addressed by the Contracting Officer in the first instance. Although the court is not aware of any cases that directly address this question in the context of a BPA for the sale of goods, other cases have recognized the authority of a subsidiary to rely upon the capabilities of its parent to meet solicitation requirements. For example in Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 744-49 (2008), the court determined that an agency properly attributed the past performance experience of a parent company to a subsidiary offeror. Similarly, in T & S Prods., Inc. v. United States, 48 Fed. Cl. 100, 109-12 (2000), the court—after reviewing several earlier GAO decisions—held that an agency can rely on a subsidiary's representations that its parent company is committed to supporting performance, even without a direct commitment from the parent. In view of this authority—coupled with the fact that the administrative record does not clearly establish the legal relationships between ADCSC, ABBOTT/DIA, and Abbott Laboratories Inc.—

the court finds that a remand is proper to allow the Contracting Officer to make that determination in the first instance.[14]

Assuming, however, that ADCSC could rely on the FSS contract of a corporate affiliate, the court rejects plaintiff's argument that ADCSC's quote did not conform to the

---

[14] In light of the remand, it might not be necessary for the court to address the TAA-related issues raised by plaintiff. In the interest of judicial economy, however, the court finds as follows with regard to plaintiff's TAA-related arguments.

First, the solicitation's terms clearly and unambiguously required offerors, at the time of bidding and award, to have a process to supply no cost TAA-compliant meters to beneficiaries. Because the court finds that the solicitation is unambiguous, the court is not permitted to consider extrinsic evidence—including DHA's pre-solicitation evaluation of [. . .]—when interpreting the solicitation's requirements. Banknote, 365 F.3d at 1353. Indeed, only [. . .] would have had standing to challenge the agency's alleged decision to exclude it from the list of "final candidates."

Second, the requirement to have a process for supplying TAA-compliant meters is plainly different than one requiring that the awardee have TAA-compliant meters on hand at the time of bidding. See Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 663 (2004) (claim that an offeror had to possess or control a compliant warehouse at time of bid was unsupported by language of solicitation). This interpretation is also in harmony with Paragraph 6 of the solicitation, which makes clear that execution of the BPA did not require immediate performance. See AR 224 ("If a UFBPA is signed by both parties, DoD will be obligated only to the extent of authorized transactions actually made pursuant to that agreement . . . ."). The court is not persuaded by plaintiff's argument that the use of the present-tense in the TAA requirement (i.e., "Must be TAA compliant") required offerors to be manufacturing TAA-compliant meters at the date when bids were submitted.

Third, having reviewed the record, the court is satisfied that the agency's determination that ADCSC could provide TAA-compliant meters under the BPA is supported by the evidence and does not provide a basis for overturning the BPA award. Because the agency took reasonable steps to inquire into ADCSC's production schedule for its Singaporean facility, this case is distinguishable from Klinge Corp. v. United States, 82 Fed. Cl. 127, 135 (2008) (agency failed to make reasonable inquiry to verify offeror's ability to comply with TAA-requirements after awardee's submissions raised questions concerning compliance).

Fourth and finally, to the extent that plaintiff believes that ARKRAY could have submitted a more competitive bid had it known that it could offer meters that were not yet being manufactured in a TAA-compliant country, plaintiff waived that objection by failing to object to the term prior to the close of bidding. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

solicitation because its meters were not listed on any FSS contract. The solicitation required offerors to "have an existing FSS Contract for any pharmaceutical agent(s) quoted" at the time of bidding and execution of a BPA. AR 225 (emphasis added). The government and defendant-intervenor are correct that offerors submitted quotes for "suites" of test strips, and that these suites did not include meters. The fact that offerors would likely recoup the cost of their meters by including the cost of the meters in the price of their test strips is of no moment. Recoupment of those costs does not transform a quote for test strips into a quote for meters. Accordingly, a straightforward reading of the solicitation reveals that offerors were not limited to proposing meters that were listed on their FSS contracts. To the extent that plaintiff believes that the solicitation was ambiguous in this regard, plaintiff waived this objection by failing to object to the term prior to the close of bidding. See Blue & Gold Fleet, L.P., 492 F.3d at 1315.

## III.  CONCLUSION

Pursuant to the court's authority under 28 U.S.C. § 1491(a)(2), this case is **REMANDED** to the DHA Contracting Officer assigned UF BPA duties to determine whether ADCSC possessed an FSS contract for all of the pharmaceutical agent(s) quoted as of the time its bid was submitted and the BPA was executed. Should the Contracting Officer rely on additional facts in making a final decision, those materials shall be provided to the court and plaintiff, along with the final decision, when the decision is submitted to the court by **July 7, 2014**. If plaintiff disagrees with the decision after remand, it shall notify the court by no later than **July 10, 2014.** If necessary, the court will conduct a status conference to set a schedule for review of the remand decision.

**IT IS SO ORDERED.**

s/Nancy B. Firestone  
NANCY B. FIRESTONE  
Judge
